UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Yeng Thao, Peter Yang, and Michelle Yeng,                Civil No. 03-5306 (PAM/RLE)
as Co-Trustees for the Heirs and Next of Kin
of Ki Yang, Deceased; and Chang Yang,

Plaintiffs,

v.                                                       **MEMORANDUM AND ORDER**

City of St. Paul, a municipal corporation;
St. Paul Police Department, a public entity;
William K. Finney, an individual; John M.
Harrington, an individual; Michael Tharalson,
an individual; Shannon Sills, an individual;
Patrick Kellerman, an individual; and John
Does 1-5,

Defendants.

_____

This matter is before the Court on Defendants' Motion for Summary Judgment. For the reasons that follow, the Court grants the Motion.

**BACKGROUND**

This case arises from the September 27, 2002, death of Ki Yang, a mentally ill man who was shot by Defendant Michael Tharalson, a St. Paul police officer. Plaintiffs assert various claims under 42 U.S.C. § 1983, as well as disability discrimination claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, and the Minnesota Human Rights Act ("MHRA").

1

A.      **Ki Yang's Mental Illness**

Ki Yang suffered from paranoid schizophrenia, which caused him to vacillate from periods of hallucinations and delusions to periods of lucidity.   Although medication controlled his symptoms, Ki Yang did not like taking medication because of undesired side effects of weight gain and puffiness.   In his unmedicated state, Ki Yang's mental condition deteriorated and he became increasingly irrational, delusional, and paranoid.   He believed that surgeons had implanted a device in him that controlled his movements and that his family was trying to kill him.   His illness caused him to attempt suicide, abuse his young children several times, threaten to kill adult relatives, and abduct and batter his wife.   Ki Yang was arrested at least six times and involuntarily committed to mental hospitals four times.

The extent of Ki Yang's mental illness varied throughout the years.   For example, in December 1996, the Social Security Administration determined that Ki Yang suffered from a depressive syndrome characterized by hallucinations, delusions, or paranoid thinking. (Margulies Aff. Ex. M.)   However, a psychiatrist who evaluated Ki Yang in 1989 concluded that Ki Yang's mood and concentration were intact even without medication.   He also noted that Ki Yang did not report any hallucinations.   During the evaluation, Ki Yang reported that he enjoyed staying home and helping his children with their homework.   He also stated that he helped with chores such as cooking, cleaning, lawn mowing, and grocery shopping.   (Margulies Aff. Ex. Q.)

In January 1993, after being arrested for abducting his wife, Plaintiff Yeng Thao, Ki Yang was committed to the maximum-security forensic wing of Mendota Mental Health

Institute in Madison, Wisconsin.   After two weeks of evaluation and treatment, physicians diagnosed Ki Yang with "a chronic psychotic illness such as paranoid schizophrenia" and concluded that he was incompetent to stand trial.   (Margulies Aff. Ex. F at 4.)   Nonetheless, an occupational therapy assessment noted that Ki Yang had a neat appearance, and was able to care for himself by doing things such as managing his own money, cooking, cleaning, and shopping.  (<u>Id.</u> at 39.)

Ki Yang remained in a mental health facility until July 1993, when psychologists opined that he had attained the requisite mental capabilities to be considered competent for trial.   The psychologists recommended that Ki Yang continue treatment with medication "to prevent a relapse of mental illness which could result in a loss of competency."   (<u>Id.</u> at 22.)   In April 1994, physicians confirmed that Ki Yang was controlled well on medication.   (Margulies Aff. Ex. Z at 5-6.)   In August 1995, a psychiatrist opined that Ki Yang represented no threat to himself or his family.  (<u>Id.</u> at 7.)

In 1997, Ki Yang complained of depression and low energy, and indicated that he did not want to take medications indefinitely. (Margulies Aff. Ex. AE at 1.)   In early 1998, Ki Yang worked for three months and then quit.   Thereafter, he stopped taking his medication. In November 2000, the Social Security Administration determined that Ki Yang was "very psychotic, paranoid [with a history] of violence and delusions" and therefore qualified for disability benefits.   (Margulies Aff. Ex. AI at 3.)   The record contains no medical evidence relating to Ki Yang's mental health status after November 2000.

**B.     The Incident on September 27, 2002**

During the evening of September 27, 2002, Plaintiff Peter Yang called 911 to report that Ki Yang had barricaded himself inside his home and refused repeated entreaties to allow his family inside.   Earlier that evening, several family members had gone to the home in an attempt to convince Ki Yang to open the door.   However, Ki Yang refused.   Given Ki Yang's history of mental illness, the family concluded that the "best way to prevent any disaster" was to call for an ambulance to take Ki Yang to the hospital.   (Jerskey Aff. Ex. 35 (Peter Yang Dep.) at 197.)   In addition, because Ki Yang had locked his family out of the house for three days, some family members needed access to personal property in the house.

In his 911 call, Peter Yang explained that Ki Yang had a long history of psychiatric problems and had stopped taking his medication.   Peter Yang stated that it would be helpful for Ki Yang to have a psychiatric evaluation and requested assistance to transport Ki Yang to a hospital.   The dispatcher sent an ambulance to the residence.   In addition, the dispatcher contacted the St. Paul Police Department to request assistance with an emotionally disturbed person.   The dispatcher conveyed the report:

> He locked his family outside, has a history of threatening to kill his family.   He hallucinates, thinks someone is after him, trying to poison him.   He has no weapons, except kitchen utensils, has a history of psychiatric problems.   Medics are enroute.

(Jerskey Aff. Ex. 28 at 8.)

Defendants St. Paul Police Officers Shannon Sills and Michael Tharalson arrived at the scene to investigate. When the officers arrived, family members relayed the same information provided to the dispatcher.

While the officers were on the scene, several family members attempted unsuccessfully to communicate with Ki Yang, who was sitting inside one of the second floor windows. Officer Tharalson stood near the family members, but stayed out of sight because a family member warned him that Ki Yang disliked police officers. While the family members were pleading with Ki Yang, Officer Sills informed the medics that they could leave. Shortly thereafter, Defendant Sergeant Patrick Kellerman, a shift patrol supervisor, arrived on the scene in response to a call from Officer Tharalson for assistance.

Based on their observations, the officers concluded that Ki Yang was not an imminent threat to himself or others. The officers therefore determined that they had no basis to forcibly enter the home to immediately detain Ki Yang.[1] The officers therefore treated the matter as a domestic situation in which a party had been excluded from the home by a person whom the officers were told committed domestic assault in the past.[2] The officers advised the

---

[1] Minnesota law provides that a peace or health officer may take a person into custody if the officer has reason to believe the person is mentally ill and in danger of injuring himself or others if not immediately detained. Minn. Stat. § 253B.05, subd. 2.

[2] The St. Paul Police Department Manual provides that:

Removing Personal Effects: This situation requires that the officer enter a home and remain while the spouse who is separating removes his/her personal effects from the residence. The officer's only responsibility is to insure that neither party assaults the other.

family that the officers could not enter the home or seize Ki Yang, but that the family could forcibly enter the house.

While some family members were attempting to break in, Plaintiff Michelle Yang and her sister went to Ki Yang's bedroom window and pleaded with him to let them in.  Ki Yang then retrieved a gun and brandished it at Michelle Yang, who screamed that Ki Yang had a gun that looked like a rifle.   Other family members, however, told the officers that the gun was actually a BB gun.

Shortly thereafter, the family members gained access to the house.   Officer Tharalson accompanied the family into the house.   Once inside, Yeng Thao asked Officer Tharalson to take her husband.   Officer Tharalson refused, explaining that Ki Yang had threatened no one. After entering the kitchen, one of the children announced that Ki Yang was approaching.    Ki Yang appeared with a BB gun in one hand and a garden sickle in the other, raised above his head. Ki Yang told everyone to get out of the house.   Officer Tharalson ordered Ki Yang to drop his gun.    Ki Yang refused and approached Officer Tharalson.    Officer Tharalson attempted to retreat, but Ki Yang continued to follow.   When Ki Yang was less than fifteen feet away, Officer Tharalson repeatedly and fatally shot him.   Officer Tharalson recounted the incident:

> I was running through the porch and he continued to come after me while I chased, while I was running and after I fired the first several rounds, and I believe I fired several more while I was running through the porch.  I got backed up into a corner of the porch and he continued to come after me.  And at one time I had my left hand on his chest, I believe, and I was backing up through the porch and he was continuing to come after me.  At one point when I was in the corner, I looked above me and there was the sickle, the blade was probably a foot or so

(Jerskey Aff. Ex. 25 § 438.11).

over my head between us and probably closer over my head.  And I fired one or two more rounds at him and pushed him to the ground and that's when he fell down.

(Jerskey Aff. Ex. 31 (Tharalson Dep.) at 137-38.)

## C.     Police Officer Training

Plaintiffs contend that the police officers' response to the 911 call caused the tragic events of September 27, 2002.  Plaintiffs' expert acknowledges that the St. Paul Police Department provides its officers with extensive training.  (Jerskey Aff. Ex. 42 (Reiter Report) ¶ 24.)   Nonetheless, he concludes that the St. Paul Police Department "was deliberately indifferent in its training, supervision, and field performance for its employees to handle issues dealing with the emotionally disturbed."  (Id. ¶ 21.)  He reasons that the St. Paul Police Department has "only a disorganized training program" addressing how to handle emotionally disturbed individuals.   (Id. ¶ 24.)  He further remarks that the officers directly involved in the incident with Ki Yang lacked knowledge of the operational aspects of such training.  (Id. ¶ 25.) He emphasizes that none of the officers had a grasp on ADA requirements.  (Id. ¶ 26.)  In addition, he opines that the officers received only nominal training on mental illness issues. (Id.)  Ultimately, he concludes that the officers' conduct "was diametrically contrary to the generally accepted practices in law enforcement."  (Id.)

Defendants' expert concludes that the St. Paul Police Department has provided reasonable training on emotionally disturbed people, emergency commitment, and applications of the ADA.  (Jerskey Aff. Ex. 44 (Katsaris Aff.) ¶ D5.)   He further opines that the officers' actions comported with their training "as well as nationally recognized police practices and

standards of care." (Id.) In addition, Defendants provide numerous training documents to show that the City of St. Paul trains its officers on how to deal with emotionally disturbed individuals.

## DISCUSSION

### A.  Standard of Review

Summary judgment is proper when the evidence viewed in a light most favorable to the nonmoving party demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, only disputes of facts that might affect the outcome of the suit under the governing substantive law will preclude summary judgment. Id. The moving party bears the burden of showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to all inferences that may be reasonably drawn from the underlying facts in the record. Meriwether v. Caraustar Packaging Co., 326 F.3d 990, 992-93 (8th Cir. 2003). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings — it must set forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 256.

### B.  Disability Discrimination Claims

Count One of the Amended Complaint seeks relief under the ADA against the City of St. Paul, the St. Paul Police Department, and Chief John M. Harrington in his official capacity ("Municipal Defendants"). Plaintiffs allege that the Municipal Defendants violated the ADA

by refusing to allow Ki Yang access to mental health services, by inadequately training their police officers on how to accommodate mentally ill individuals in crisis situations, by failing to conduct a self-evaluation plan, and by refusing to modify their services to accommodate the mentally disabled.    Count Two alleges that the Municipal Defendants violated the Rehabilitation Act by maliciously or recklessly excluding Ki Yang "from participation in, denying him the benefit of, and subjecting him to discrimination in the benefits and services Defendants provide to the general public."   Count Six alleges that all Defendants violated the MHRA by denying Ki Yang access to full utilization of, or benefit from, a public service because of his disability.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such an entity."   42 U.S.C. § 12132.   Similarly, the Rehabilitation Act provides that no "qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."   29 U.S.C. § 794(a).   The MHRA prohibits discrimination "in the access to, admission to, full utilization of or benefit from any public service because of . . . disability."  Minn. Stat. § 363A.12, subd. 1.

The parties agree that the analysis courts use in ADA cases applies to all three claims. Thus, to prevail on the discrimination claims, Plaintiffs must show that: (1) Ki Yang was a

qualified individual with a disability,[3] (2) he was denied the benefits of a public entity's service or program or otherwise discriminated against, and (3) the denial or discrimination was based on his disability.  Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999).

     1.    Qualified Individual with a Disability

Although the parties agree that Ki Yang was mentally ill, the Municipal Defendants argue that Plaintiffs have failed to show that Ki Yang was disabled.  To be deemed disabled, an individual must: (1) have a physical or mental impairment that substantially limits[4] one or more of his major life activities; (2) have a record of such an impairment; or (3) be regarded as having such an impairment.[5]  42 U.S.C. § 12102(2).  Major life activities include speaking,

---

[3]    A qualified individual with a disability is an individual with a disability who, with or without reasonable modifications, "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

[4]    The MHRA definition of a disabled individual is similar to the ADA definition with one exception: the impairment must materially limit one or more major life activity.  Minn. Stat. § 363A.03, subd. 12.  The "materially limits" standard under the MHRA is less stringent than the ADA "substantially limits" standard.  Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004).  In all other respects, courts apply the same analysis to ADA and MHRA claims.  Id.

[5]    An individual has a "record of" disability if he "has a history of, or has been mis-classified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k).  Plaintiffs presented insufficient evidence to satisfy this definition.  See Heisler v. Metro. Council, 339 F.3d 622, 630 (8th Cir. 2003) (rejecting the plaintiff's argument that her numerous hospitalizations established that she had a record of an impairment).  The "regarded as" definition requires Plaintiffs to show that the Municipal Defendants either mistakenly believed that Ki Yang had a mental impairment that substantially limited one or more major life activity, or mistakenly believed that an actual, non-limiting impairment substantially limited one or more major life activity.  See Ollie v. Titan Tire Corp., 336 F.3d 680, 685 (8th Cir. 2003) (citation omitted).  Plaintiffs point to no evidence that supports this finding.  Accordingly, the Court focuses only on whether Ki Yang was actually disabled on September 27, 2002.  See Samuels v. Kan. City Mo. Sch. Dist., 437 F.3d 797, 801 (8th Cir. 2006) (courts must determine whether an individual is entitled to

hearing, learning, caring for oneself, performing manual tasks, walking, seeing, breathing, and working.  29 C.F.R. § 1630.2(i).

"Whether an impairment substantially limits a major life activity is a threshold question."  Samuels v. Kan. City Mo. Sch. Dist., 437 F.3d 797, 801 (8th Cir. 2006) (quoting Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1206 (8th Cir. 1997)).  An individual's major life activities are substantially limited if the impairment "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002).  The Court considers the nature and severity of the impairment, as well as its duration and long-term impact.  29 C.F.R. § 1630.2(j)(2)(i-iii).

a.    Major Life Activity of Working

Plaintiffs contend that Ki Yang was substantially limited in his ability to work.  To prevail on this claim, Plaintiffs must show that Ki Yang was unable to work in a broad class of jobs.  See Samuels, 437 F.3d at 801-02; see also 29 C.F.R. § 1630.2(j)(3)(i).

Plaintiffs rely exclusively on Ki Yang's medical history and on the Social Security Administration's determination that Ki Yang was unable to work.  However, the Supreme Court has instructed that it is "insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment."  Toyota Motor Mfg., Ky., 534 U.S. at 198.  Similarly, a record of hospitalization does not show that the impairment for

protection under the ADA when the adverse action occurs).

which an individual is hospitalized imposed a substantial limitation on one or more major life activities. Heisler v. Metro. Council, 339 F.3d 622, 630 (8th Cir. 2003); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 646 (2d Cir. 1995). Likewise, Social Security determinations of disability are not synonymous with a determination of disability under the ADA. See Robinson v. Neodata Servs., Inc., 94 F.3d 499, 502 n.2 (8th Cir. 1996) (rejecting plaintiff's argument that the Social Security Administration's determination that she was totally disabled had a preclusive effect on the issue of whether she was disabled under the ADA); Horwitz v. L. & J.G. Stickley, Inc., 20 Fed. Appx. 76, 80 (2d Cir. 2001) (rejecting plaintiff's argument that in order to receive Social Security disability benefits as a result of her bipolar disorder, she had to have been adjudged disabled to such an extent that she was unable to perform a major life activity); LeClair v. Wells Fargo Bank Iowa, N.A., 291 F. Supp. 2d 873, 881 (S.D. Iowa 2003) (granting summary judgment in favor of defendant when plaintiff, who was diagnosed with mental illness, relied exclusively on her medical history and receipt of Social Security disability benefits); Couts v. Beaulieu Group, LLC, 288 F. Supp. 2d 1292, 1304 (N.D. Ga. 2003) ("An individual may receive disability benefits from the Social Security Administration and yet not have an impairment that substantially limits one or more major life activities for purposes of the ADA."); Hayes v. Philadelphia Water Dep't, No. 03-6013, 2005 WL 745857, at *8 n.20 (E.D. Pa. Mar. 31, 2005) ("unlike the social security disability scheme, which employs various presumptions based on listed impairments, the ADA's disability inquiry is made on a case-by-case basis"); Weiss v. City of New York, No. 96-8281, 2003 WL 1621403, at *3 (S.D.N.Y. Mar. 28, 2003) (receiving Social Security benefits does

12

not necessarily mean that condition constitutes disability under the ADA); <u>see also</u> <u>Cleveland</u> <u>v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 802-03 (1999) (because of differences in the definitions of "disability" under the ADA and the Social Security Act, a person could be considered disabled by the Social Security Administration but yet also fail to be substantially limited in performing major life activities according to the ADA).

Instead, the Court must conduct an "individualized inquiry" and determine whether the limitation was substantial in terms of the individual's own experience. <u>Sutton v. United Air</u> <u>Lines, Inc.</u>, 527 U.S. 471, 483 (1999). To make the individualized determination as it relates to the major life activity of working, the Court considers: (1) the accessible geographic area; (2) the numbers and types of jobs in the area foreclosed due to an individual's impairment; and (3) the types of training, skills, and abilities required by the jobs. <u>See</u> 29 C.F.R. § 1630.2(j)(3)(ii).

The record is devoid of evidence needed to make an individualized determination of whether Ki Yang was substantially limited in the major life activity of working. On this point, <u>Sanchez v. ACAA</u>, 247 F. Supp. 2d 61 (D. P.R. 2003), is markedly similar to the instant case. In <u>Sanchez</u>, the plaintiff suffered from chronic paranoid schizophrenia, schizo-affective disorder, and agoraphobia. However, he failed to bring forth any evidence about the accessible geographic area, the numbers and types of jobs in the area foreclosed because of the impairment, and the types of training, skills, and abilities required by the jobs. The court

13

therefore determined that the plaintiff had failed to establish he was substantially limited in the major life activity of working  Id. at 69-71.

The same is true here.  Plaintiffs fail to offer evidence that Ki Yang was significantly restricted in his ability to perform either a class of jobs or a broad range of jobs.  Indeed, Plaintiffs admit that Ki Yang did not attempt to find work after leaving his last job in 1998.[6] Consequently, Plaintiffs fail to show that Ki Yang was substantially limited in his ability to work.

> b.    Major Life Activity of Caring for Oneself

Plaintiffs also maintain that Ki Yang was substantially limited in the major life activity of caring for himself.  However, the record shows otherwise.  Ki Yang lived alone from April 2002 to June 2002.  During that time, he not only cared for himself, but he also prepared lunch for his children when they visited him.  During their visit, the children noted that Ki Yang was dressed appropriately and maintained his home.  After June 2002, when Plaintiff Chang Yang lived with Ki Yang for several months, Ki Yang stayed to himself and did not rely on his family to care for him.  Indeed, Ki Yang not only cared for himself, but occasionally babysat his infant grandchild.  The Court acknowledges that Ki Yang locked himself in the house for three days, and empathizes with Plaintiffs' concerns for Ki Yang's well-being.  However, Plaintiffs have

---

[6]    Moreover, the record shows that Ki Yang was able to work when he took his medication, which contravenes a finding of disability.  See Sutton, 527 U.S. at 482-83 (a person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that substantially limits a major life activity).

failed to present any evidence that Ki Yang was substantially limited in his ability to care for himself in September 2002.

Plaintiffs' exclusive reliance on Ki Yang's medical diagnoses and Social Security determinations is fatal to their disability discrimination claims.   The evidence, which spans a period from 1985 to 2000, does not establish that Ki Yang was substantially limited in a major life activity in September 2002.   Consequently, Plaintiffs fail to show that Ki Yang was disabled, and summary judgment on Counts One, Two, and Six of the Amended Complaint is appropriate.

2.    Denying the Benefit of a Public Service

Although the Court dismisses the disability discrimination claims based on Plaintiffs' failure to show that Ki Yang was disabled, the Court is compelled to address another argument advanced by Plaintiffs: that the Municipal Defendants denied Ki Yang the benefit of a public service by inadequately training their police officers.

Plaintiffs contend that the police officers failed to reasonably accommodate Ki Yang by mishandling their response to the 911 call.   Specifically, Plaintiffs contend that the officers should not have encouraged the family to break into the home.   Rather, according to Plaintiffs, the officers should have secured mental health services or otherwise contacted a mental health provider.   In addition, Plaintiffs contend that the officers should have instructed the ambulance to remain on the scene.   Plaintiffs argue that the inadequacy of ADA training led to these failures to accommodate Ki Yang.   In essence, Plaintiffs argue that the ADA imposes an

affirmative burden on the Municipal Defendants to train its officers on reasonably accommodating mentally ill individuals.   The Eighth Circuit Court of Appeals has not addressed whether a municipality can be liable under the ADA for failing to properly train police officers on methods to handle mentally impaired individuals.   Indeed, case law on the issue is sparse.

Once a scene is secure, police officers have a duty to reasonably accommodate an individual's disability.   Gorman v. Bartch, 152 F.3d 907, 911-14 (8th Cir. 1998); Hainze v. Richards, 207 F.3d 796, 802 (2000).   However, the ADA "does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."   Hainze, 294 F.3d at 801.   Relying on Hainze, Judge Montgomery recently held that the failure to train officers to deal with mentally impaired individuals does not create an ADA claim.   See Sanders v. City of Minneapolis, No. 03-5817, 2005 WL 3536129, at *7 (D. Minn. Dec. 23, 2005).

Plaintiffs do not challenge either Hainze or Sanders.   Rather, they argue that these cases are inapposite because the cases involved police officers coming upon exigent circumstances. According to Plaintiffs, the instant case involved a secured area until the police officers destabilized the situation.   Plaintiffs further submit that proper training on how to accommodate the mentally disabled would have precluded the tragic events.

Plaintiffs rely on <u>Schorr v. Borough of Lemoyne</u>, 243 F. Supp. 2d 232 (M.D. Pa. 2003), which upheld an ADA claim based on the police department's failure to institute a policy to accommodate disabled individuals and failure to provide police officers training to handle a non-exigent situation peacefully. In <u>Schorr</u>, police officers shot and killed a mentally ill individual while attempting to involuntarily commit him. <u>Id.</u> at 233. In determining that the improper training claim fell within the scope of the ADA, the <u>Schorr</u> court found that the alleged ADA violation did not occur during the violent encounter between the officers and the individual. Rather, it occurred "well before that day, when the Defendant policy makers failed to institute polices to accommodate disabled individuals" by training the officers on how handle the situation peacefully. <u>Id.</u> at 238.

This Court respectfully disagrees with <u>Schorr</u>. The Court recognizes that the disability discrimination statutes are remedial in nature and therefore must be construed broadly. However, the Court cannot impose a requirement that the clear text of the statutes does not require. A violation occurs when a disabled individual is excluded from the participation in, or denied benefits of, a service, program, or activity. Thus, a violation does not occur until the exclusion or denial occurs. <u>See</u> <u>Gorman</u>, 152 F.3d at 912-13 (police officers failed to accommodate a disabled arrestee when they improperly transported him to the station). Of course, the Municipal Defendants would be prudent to train their officers to comply with the ADA and therefore avoid liability. However, a failure to train does not equate to a failure to reasonably accommodate.

17

Moreover, the failure of the Municipal Defendants to train their police officers about the ADA affects all disabled persons, not just Ki Yang. Thus, Plaintiffs cannot demonstrate that the Municipal Defendants intentionally discriminated against Ki Yang specifically by failing to train. "Acts and omissions which have a disparate impact on disabled individuals in general are not specific acts of intentional discrimination" against a particular person. See Dillary v. City of Sandusky, 398 F.3d 562, 568 (6th Cir. 2005) (quoting Tyler v. City of Manhattan, 118 F.3d 1400, 1403 (10th Cir. 1997)). Accordingly, the Court concludes that a failure to train claim is not cognizable under the disability discrimination statutes.

## C.      Excessive Force Claim

Count Three of the Amended Complaint seeks relief under 42 U.S.C. § 1983 against Sergeant Kellerman and Officers Tharalson and Sills ("Officer Defendants"). It alleges that the Officer Defendants violated the Fourth and Fourteenth Amendments through the use of excessive force and deprivation of life.

The Officer Defendants contend that they are entitled to qualified immunity. The Court conducts a three-part inquiry to determine whether qualified immunity applies: (1) whether Plaintiffs have asserted a violation of Ki Yang's constitutional rights, (2) whether the allegedly violated constitutional right was clearly established, and (3) whether there are no genuine issues of material fact regarding whether a reasonable official would have known that the alleged acts violated that right. Foulks v. Cole County, 991 F.2d 454, 456 (8th Cir. 1993). "If no constitutional right would have been violated were the allegations established, there is no

18

necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001). Here, Plaintiffs' claims fail for want of a constitutional violation.

The Court applies an objective reasonableness standard to analyze claims that law enforcement officers have used excessive force. Graham v. Connor, 490 U.S. 386, 395 (1989). Reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the vision of hindsight. Id. at 396. The reasonableness determination must allow for the fact that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary." Id. at 396-97. The question is whether the officer's action is objectively reasonable, without regard to their underlying intent or motivation. Id. at 397. The Court considers the circumstances of each particular case, including whether the individual posed an immediate threat to the safety of the officer or others. Id. at 396. In addition, an individual's "emotionally disturbed status may be relevant to the trial court's determination of objective reasonableness." Ludwig v. Anderson, 54 F.3d 465, 472 (8th Cir. 1995); see also Bates v. Chesterfield County, 216 F.3d 367, 373 (4th Cir. 2000) ("Just like any other relevant personal characteristic — height, strength, aggressiveness — a detainee's known or evident disability is part of the Fourth Amendment circumstantial calculus."). Of course, the "intrusiveness of a seizure by means of deadly force is unmatched." Tenn. v. Garner, 471 U.S. 1, 9 (1985). Nonetheless, an officer may use deadly force if he has probable cause to believe that the individual "poses a significant threat of death or serious physical injury to the officer or others." Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003).

1.      Claims against Officers Tharalson and Sills

Plaintiffs claim that the seizure of Ki Yang was objectively unreasonable because, despite knowledge of Ki Yang's emotional instability, Officers Tharalson and Sills exacerbated the situation and provoked chaos.  They rely on Ludwig v. Anderson, 54 F.3d 465 (8th Cir. 1995).   In that case, a concerned citizen called the police to aid a seemingly emotionally disturbed man.   When the police officers arrived at the scene, the man was cooperative. However, he became excited when a uniformed officer in a marked car arrived.   Thereafter, despite knowing their actions could agitate the individual, the officers spoke to Ludwig in a loud voice, pulled a gun on him, arrived at the scene with activated lights, and maced him. Chaos ensued.  Ludwig pulled out a knife and began to run away.  The officers attempted to stop Ludwig by colliding into him with a police car, and ultimately shot him.   Id. at 467-69.   The Eighth Circuit reversed the district court's decision to grant summary judgment, holding that a question of fact remained whether Ludwig's actions at the time of the shooting posed a significant threat of serious harm.  Id. at 473.

Ludwig is factually distinguishable.   In that case, the Eighth Circuit heavily focused on testimony that the shooting officer was in no immediate fear for his safety because Ludwig was eight to twenty-five feet away from the officer and was running away.  Id. at 469.   The Eight Circuit also noted that Ludwig never lunged or otherwise attacked a police officer, and was running away from all bystanders.  Id.   In contrast, Ki Yang posed a serious risk of physical harm to Officer Tharalson.   Despite orders to drop his weapons, Ki Yang actively pursued Officer Tharalson while armed with a sickle and gun.   Officer Tharalson reasonably believed

that Ki Yang was about to strike him with a sickle.  "Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual." Bates, 216 F.3d at 372. The circumstances in the residence were tense, uncertain, and rapidly evolving.  It was objectively reasonable for Officer Tharalson to fire his gun under such circumstances.  Indeed, none of the actions by Officer Tharalson or Officer Sills were constitutionally defective.

> 2.    Excessive Force Claim against Sergeant Kellerman

Plaintiffs claim that Sergeant Kellerman is individually liable for the allegedly excessive force used against Ki Yang.  A supervisor is subject to 42 U.S.C. § 1983 liability "if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997) (quoting Tilson v. Forrest City Police Dep't, 28 F.3d 802, 806 (8th Cir. 1994). However, because there is no underlying constitutional violation, this claim fails.

**D.    Failure to Train**

Count Four seeks relief under 42 U.S.C. § 1983 against the Municipal Defendants, alleging that they failed to adequately train St. Paul police officers in dealing with mentally ill individuals and in complying with the requirements of the ADA and the Rehabilitation Act.

A governmental entity may be liable under 42 U.S.C. § 1983 for constitutional violations resulting from its failure to adequately train its employees if the failure to train rises to the level of deliberate indifference to the individual's rights. Larkin v. St. Louis Hous. Auth.

Dev. Corp., 355 F.3d 1114, 1117 (8th Cir. 2004).  To survive summary judgment, Plaintiffs must present evidence that the Municipal Defendants were on notice that their training procedures were inadequate and likely to violate constitutional rights.  Id.  The Court may infer notice if the failure to train "is so likely to result in a violation of constitutional rights that the need for training is patently obvious," or if "a pattern of misconduct indicates that [the Municipal Defendants'] response to a regularly recurring situation is insufficient to protect the people's constitutional rights."  Id.  (citations omitted).  When analyzing the alleged failure to train, the Court focuses on the Municipal Defendants' training policy — not how the officers absorbed the training.  Id.

Plaintiffs have failed to show that the Municipal Defendants acted with deliberate indifference in the training they provide to police officers.  To the contrary, the record shows that Sergeant Kellerman and Officers Tharalson and Sills received training specifically relating to mentally ill individuals.  Although Plaintiffs criticize the training as insufficient, they have failed to show that "the need for more or different training was so obvious and the inadequacy so likely to result in the violation of constitutional rights."  Liebe v. Norton, 157 F.3d 574, 579 (8th Cir. 1998); see also Jennings v. Wentzville R-IV Sch. Dist., 397 F.3d 1118, 1122-23 (8th Cir. 2005) ("effective training need not specifically address every conceivable situation an employee may encounter").  Moreover, the record does not show that the Municipal Defendants had any indication that their policies were likely to result in a constitutional violation.  To the contrary, the record shows that the Municipal Defendants received

commendations on police officers' responses to mentally ill individuals.   (Jerskey Aff. Ex. 26.)  Accordingly, Count Four fails as a matter of law.

### E.    Failure to Supervise

Count Five seeks relief under 42 U.S.C. § 1983 against former Chief William K. Finney and Sergeant Kellerman in their official and individual capacities based on their alleged failure to adequately train and supervise Officers Tharalson and Sills in dealing with mentally ill persons and in complying with the ADA and the Rehabilitation Act.   These claims fail as a matter of law because, as discussed above, there is no underlying constitutional violation.  See Williams v. Davis, 200 F.3d 538, 539 (8th Cir. 2000) (absent constitutional violation, supervisors cannot be liable for alleged failure to respond appropriately to mistreatment).

### F.    Unreasonable Danger

Count Seven seeks relief under 42 U.S.C. § 1983 against Officers Tharalson and Sills in their individual capacities and against Sergeant Kellerman in his individual and supervisory capacity, alleging that these Defendants acted with recklessness and deliberate indifference in creating a dangerous situation by encouraging Plaintiffs to break into Ki Yang's house and by failing to protect Plaintiffs from an increased risk of a violent confrontation with Ki Yang. This claim fails because, as discussed above, there is no underlying constitutional violation and because Plaintiffs have failed to meet the standard for deliberate indifference.

### CONCLUSION

Undoubtedly, Ki Yang suffered from a severe mental illness that made his life difficult.

The Court does not mean to minimize the effects of Ki Yang's mental illness. However, Plaintiffs have failed to present evidence sufficient to establish his impairment rose to the level of substantial limitations that is required to maintain a claim under the disability discrimination statutes. Moreover, Plaintiffs have failed to create a genuine issue of material fact relating to their excessive force, failure to train, failure to supervise, and unreasonable danger claims under 42 U.S.C. § 1983. Accordingly, based upon all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Clerk Doc. No. 49) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: April 13, 2006

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge